MARK E. VOVOS, #4474
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220
*Attorney for Hunter Bow O'Mealy*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

     Plaintiff,

v.

HUNTER BOW O'MEALY,

     Defendant.

NO. 2:21-CR-00142-TOR-1

**MOTION TO SUPPRESS ALL PHYSICAL EVIDENCE AND STATEMENTS AS A RESULT OF TRAFFIC STOP**
**(Evidentiary Hearing Requested)**

**May 19, 2022 at 9:00 a.m.**

## __MOTION__

  Comes now Hunter Bow O'Mealy, through his attorney Mark E. Vovos, pursuant to Rule 12 of the Federal Rules of Criminal Procedure and moves this Court for an order suppressing all evidence, as well as any oral statements from Hunter Bow O'Mealy, or any other evidence seized or obtained which the government may intend to use at a trial in this action, resulting from a traffic stop on or about August 18, 2021 in the Western District of Washington, near Centralia, Washington. The grounds for the suppression are that the obtaining of the physical

MOTION TO SUPPRESS - 1

evidence and oral statements, or any other evidence, is a result of an illegal search and seizure.

This motion is based upon the Fourth, Fifth and Sixth Amendment to the United States Constitution, Rule 12 of the Federal Rules of Criminal Procedure, the files and records herein, and the accompanying declaration of counsel, as well as a memorandum in support of this motion.

## **MEMORANDUM**

### FACTUAL BACKGROUND[1]

The following is a summary of the facts as counsel understands them at this time. Not all percipient fact witnesses have been able to be contacted and further investigation is necessary.

On August 11, 2021, a confidential source contacted law enforcement officers concerning an alleged shipment or purchase of Fentanyl that was to be purchased by Mr. O'Mealy. This tip, unverified, from a confidential source, suggested that the Fentanyl would be transported at an unknown specific location.

---

[1] By this motion, Hunter Bow O'Mealy does not concede the veracity of any law enforcement reports prepared in this case. The arrest events were not recorded based on discovery provided to date, and Mr. O'Mealy reserves the right to challenge the government's version of events at trial or any pre-trial hearing concerning this motion.

MOTION TO SUPPRESS - 2

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

That on or about this date, law enforcement had been monitoring a ping established on Mr. O'Mealy's phone that was obtained by a search warrant in Case No. 2:21-MJ-00419-JTR. The ping was observed on Mr. O'Mealy's phone in the Santa Monica, California area the night of August 13, 2021, and the ping showed Mr. O'Mealy arriving in Phoenix, Arizona on the morning of August14, 2021. The confidential source provided information that he believed, with no factual information that Mr. O'Mealy and others were en route to Arizona based on pictures in Snapchat.

Law enforcement attempted to locate the vehicles connected with Mr. O'Mealy and Mr. Carr and were unsuccessful using the ping radius based on the search warrant obtained in Case No. 2:21-MJ-00419-JTR. Apparently, law enforcement located a maroon-colored Honda Insight with Washington plates, with the registered owner in Tacoma, Washington, in the parking lot of the Marriott Phoenix Airport Hotel. The confidential source sent information that Mr. O'Mealy and Mr. Carr were in a hotel in Peoria, Arizona. Law enforcement was able to confirm that the hotel room that Mr. O'Mealy was in was the Marriott Hotel and an administrative subpoena was served on the Marriott and at a later date, records of the guests were received. There is no time sequence as to when this report was received.

MOTION TO SUPPRESS - 3

On August 15, 2021, a confidential source provided information concerning Mr. Carr and that he may possibly be traveling back to Arizona. On August 17, 2021, a confidential source provided information that Mr. O'Mealy was headed back to Tacoma, Washington. There was no date or time specified. Law enforcement monitored the ping information on Mr. O'Mealy's phone and observed some movement west from their location on the evening of August 17, 2021, and then overnight into the morning of August 18, 2021. The pinging showed the phone moving north through California.

On August 18, 2021, law enforcement verified, they say, that the Honda vehicle passed a license plate reader in Southern California at about a time and place that Mr. O'Mealy's phone pinged in the area. Special Agent Fine and the Joint Task Force were directed to the area of the pings and gave him a description of the Honda Insight.

<u>THE STOP</u>

On August 18, 2021, Mr. O'Mealy was stopped while driving the maroon-colored Honda Insight on Interstate 5 by the Joint Task Force near Centralia, Washington. The police had no warrant. As a result of the stop, using a dog that the Task Force had with them and a subsequent search warrant on the vehicle, resulted in items being seized. At the same time of this stop on August 18, 2021, a gray

MOTION TO SUPPRESS - 4

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

2008 Acura, that was traveling on the same highway, was stopped. A subsequent search warrant was served on that vehicle and three people were traveling in that car.

All the passengers in the Acura were identified and released, and the vehicles were then seized until search warrants were obtained.

The is no temporal sequence of time as to the length of the stop or when the actual search of the vehicle took place.

## **ARGUMENT**

A.    <u>The Use of a Pretextual Stop Is a Violation of the Fourth Amendment</u>.

The using of a pretextual stop as planned by the officers in this case to conduct a vehicle stop is unreasonable and in violation of the Fourth Amendment. *United States v. Orozco,* 858 F.3d 1204 (2017). The court in *Orozco* found that because the stop only occurred due to a tip that Orozco may be carrying drugs in his vehicle and officers needed to conduct a stop to obtain any reasonable suspicion. Coupled with the fact that absent the tip, the stop would have never occurred, the stop was solely pretextual, and therefore, a violation of the Fourth Amendment. *Orozco,* 858 F.3d. 1204. The court in *Orozco* also found that a consent to search and the subsequent evidence was given only after an hour of detention and was fruit of an unlawful stop. *Orozco* is directly on point with law

MOTION TO SUPPRESS - 5

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

and facts similar to Mr. Hunter Bow O'Mealy's stop. The only reason that the officer wanted to pull over the Honda Insight was due to an alleged tip. However, they claim the stop was for speeding. The stop was used as a means to attempt to obtain suspicion without the tip of Mr. O'Mealy's vehicle, the stop never would have occurred.

The pretextual used in Mr. O'Mealy's vehicle stop was unreasonable as officers had not observed any reason to believe he was breaking the law by the Honda Insight and had not observed any traffic violations. Furthermore, the stop was solely pretextual, and without the tip the officers had received, they never would have pulled over the Honda Insight that Hunter Bow O'Mealy was driving. Therefore, their pretextual stopped detention and subsequent evidence seized was a violation of the Fourth Amendment.

B.    Vehicles and Dog Searches – The Pretextual Stop was Planned Two Days Before the Stop to Allow a Dog Search.

In *Florida v. Jardines,* 133 S.Ct. 1409 (2013), police had anonymous information that a person at a particular residence was trafficking in marijuana. Police went to the residence with a drug dog, and the dog sniffed the area around the front door. The Court held that the use of a trained police dog to investigate a

MOTION TO SUPPRESS - 6

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

home and its immediate surroundings constituted a search under the Fourth Amendment.

In *Illinois v. Caballes,* 125 S.Ct. 834 (2005), an Illinois state trooper stopped a defendant motorist for speeding. As the trooper was writing a ticket, a second officer came to the scene and walked the drug dog around the defendant's car. The dog alerted. Based on the lower court's factual rulings, the Supreme Court assumed the duration of the stop was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop. In the opinion, the court noted that under these circumstances, "the dog sniff performed on the exterior of the respondent's car while he was lawfully seized for a traffic violation" did not offend the Fourth Amendment. The court commented that the stop lasted ten minutes.

Justice Souter articulated a great dissent in terms of the co-called reliability of the dog:

> The infallible dog, however, is a creature of legal fiction. Although the Supreme Court of Illinois did not get into the sniffing averages of drug dogs, their supposed infallibility is belied by judicial opinions describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine. (See attached **Ex. A**)

MOTION TO SUPPRESS - 7

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

C.   Notwithstanding the Previous Arguments, Even if the Original Stop May Have Been Legal for Some Reason, the Subsequent Detention, Questioning and Search Went Beyond the Scope of What was Justified.

In the United States, it is established that in terms of the Fourth Amendment, a traffic stop is a seizure of the driver, even though the purpose of the stop is limited, and the detention is brief. *Brendlin v. California,* 551 U.S. 249 (2007). A lawful seizure such as this can violate the Fourth Amendment if its manner and execution unreasonably infringe interests that are protected by the Constitution. *Illinois v. Caballes,* 543 U.S. 405, 407 (2005). By way of example, when a traffic stop has been conducted, the officer must only detain the individual for a reasonable amount of time to accomplish the mission. *Caballes,* 543 U.S. 407. An average traffic stop will last long enough for an officer to check the driver's license and registration to ensure the driver has the qualifications and is entitled to drive the vehicle, and depending on the situation, issue the driver a citation. *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 2007). If the stop is prolonged past the reasonable amount of time, officers must have a reasonable suspicion of wrongdoing. *United States v. Perkins,* 384 F.3d 965, 970 (9th Cir. 2003).

It is recognized in the United States that an investigative detention must be temporary and only last as long as necessary to effectuate the purpose of the stop. *Florida v. Royer,* 460 U.S. 491, 590 (1983); *United States v. Leo*, 792 F.3d 742,

MOTION TO SUPPRESS - 8

751 (7th Cir. 2015). If the stop is unnecessarily prolonged, it becomes a *de facto* arrest and requires probable cause. In *Rodriguez v. United States,* 135 S.Ct. at 1612, the Supreme Court described the traffic stop as similar to a *Terry* stop as they are both only brief encounters.

In *Rodriguez v. United States,* 135 S.Ct. 1609, 1664 (2015), the Supreme Court considered whether the use of a drug sniffing dog reasonably prolongs a traffic stop. Because the use of a dog sniff is to uncover criminal wrongdoing, rather than determine the need to issue a traffic ticket, it unreasonably prolongs the stop. This is true even if the sniff occurs before a ticket is issued. *Rodriquez,* 125 S.Ct. 1609, 1614. The court again established that a traffic stop is only reasonable for as long as it takes for the officers to complete the tasks associated with the reason for the stop. *Id.* In an average situation, which would include checking the driver's license, insurance, and the registration. In this case, considering the pretextual and any other non-existent factual scenario that the officers could muster, the officers went beyond the Constitution and Fourth Amendment.

Since the police illegally prolonged the stop of Mr. O'Mealy, all the evidence obtained after his Fourth Amendment rights had been violated should be suppressed, including physical evidence and his statements. *United States v. Patzer,* 277 F.3d 1080, 1085-86 (9th Cir. 2007).

MOTION TO SUPPRESS - 9

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

D.    Empirical Research Casts Doubt on the Reliability of Drug-Detection Dogs.

A police dog's indication of contraband is construed as a type of informant's tip. *See Florida v. Harris,* 568 U.S. 237, 244, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013).

E.    Empirical Research Demonstrates that Drug-Detection Dogs Are Often Unreliable.

The "tips" that drug-detection dogs provide may be unreliable, as these dogs frequently give false alerts, or "false positives." The length of the dogs' workday, among other circumstances, can radically affect the reliability of the alert. A 2001 study cited by dog proponents to suggest the *reliability* of dog drug detection concludes that dogs issue false alarms between 12.5% and 60% of the time in experimental conditions.[2] *See Illinois v. Caballes,* 543 U.S. 405, 412 (2005) (Souter, J., dissenting) (criticizing Illinois's reliance on this study as indicia of canine reliability). Even though the dogs were specially trained to work for long periods to detect certain smells, the dogs' performance steadily deteriorated as they worked. Garner, *supra* n.2 at 12. After only two hours of work, the dogs' rate of

---

[2]    Kelly J. Garner et al., *Duty Cycle of the Detector Dog: A Baseline Study* 12 (2001) http://info.dsiiti.com/hs-fs/hub/40565/file-14168106-pdf/docs/6-8-09_dutycycle_of_police_dog.pdf.

MOTION TO SUPPRESS - 10

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

false alarms spiked to 60%. *Id.* This study, among other considerations, led Justice Souter to conclude that the "infallible dog" is a creature of legal fiction." *Caballes,* 543 U.S. 405 at 411.[3]

Further, empirical literature reveals that dogs' highly sensitive sense of smell can indicate a wide range of both legal and illegal substances. For example, dogs do not smell heroin *per se,* but rather alert to the acetic acid in heroin, which is a common substance also found in pickles and certain glues. Katz & Golembiewski, *supra* n.3 at 755. The organic chemical compound which a dog alerts to in cocaine, methyl benzoate, is found in many legal products, including foods, pharmaceuticals, and personal products. *Id.* (discussing challenges of effectively training drug dogs to alert to cocaine, as cocaine initially emits very high levels of methyl benzoate, but soon reduces to levels consistent with legal products). In addition to these more basic studies examining the reliability of drug-detecting dogs, other studies examine how human behavior influences the reliability of their canine partners.

---

[3] False positive rates also range dramatically among dogs. While some dogs rarely err, others are far more reactive, with judges determining false positive rates to reach over 50%. Lewis R. Katz & Aaron P. Golembiewski, *Curbing the Dog: Extending Protection of the Fourth Amendment to Police Drug Dogs,* 85 Neb. L. Rev. 735, 757 (2007).

MOTION TO SUPPRESS - 11

F.   <u>Empirical Research Demonstrates that Drug-Detection Dogs Are Influenced by Their Handlers.</u>

Dogs may also be unreliable "informants" because human cues have a powerful impact on dog behavior. Scientists have found that dogs respond to many types of human characteristics and behaviors, including their handler's gender, personality, eye movements, gestures, posture, head orientation, proximity, and voice. Lisa Lit et al., *Handler Beliefs Affect Scent Detection Dog Outcomes,* 14 Animal Cognition 387, 388 (2011) (citation omitted). Sometimes dogs trust humans above and beyond their own senses. In one study, almost half the dogs approached an empty bowl indicated by human pointing rather than a bowl where the dog had already seen and smelled food. *Id.* at 388 (citations omitted). Not only are dogs *not* neutral, but human cues can override powerful sensory inputs – like food.

Dr. Lit's recent double-blind study, *Handler Beliefs Affect Scent Detection Dog Outcomes,* demonstrates that even trained police dogs become more error-prone due to handler beliefs. Researchers at the University of California, Davis, invited eighteen police dogs and their handlers to participate in a study in which they would attempt to detect the presence of contraband. *Id.* at 388-90. Unbeknownst to the handlers, there was no contraband whatsoever, so any dog

MOTION TO SUPPRESS - 12

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

alerts were false positives. *Id. at 389.*[4]  In total, the handlers reported their dogs to have (erroneously) alerted 85% of the time when there was no contraband present – a glaring error rate. *Id.* at 390. Moreover, false positives were especially prevalent when the handler held preconceived notions about the presence of contraband – and inadvertently cued his or her dog. *Id.* at 392-93. The researchers noted that "the overwhelming number of incorrect alerts identified across conditions *confirms that handler beliefs affect performance." Id.* at 391 (emphasis added).[5]

---

[4]  Each of the four rooms had four possible "conditions": (1) control; (2) red paper marker; (3) unmarked decoy scent (sausage and tennis ball); and (4) red paper marker at the decoy scent. *Id.* at 389. Before the dogs inspected a room, the researchers instructed their handlers that each condition might contain up to three target scents, and that target scent markers consisting of a red piece of construction paper would be present in two conditions. *Id.* at 389. In actuality, these red papers were decoys and there was no contraband, but the handlers were none the wiser. *Id.*

[5]  At least one court has cited the Lit et al. study to support its suggestion that "the time might be right for a reevaluation of the proper training, certification, use and application of the dog sniff as a tool of law enforcement and as a means to enable intrusion into Fourth Amendment protected space." *United States v. One Million, Thirty-Two Thousand, Nine Hundred Eighty Dollars in U.S. Currency,* 855 F.Supp.3d 678, 722 (N.D. Ohio 2012). The same court in a different case did not find the study persuasive, criticizing the study for not employing a complete double-blind protocol. *United States v. Rhee,* No. 3:12CR2, 2014 WL 2213079 at *4 (N.D. Ohio May 28, 2014). However, the study employed the double-blind protocol to the extent possible, Lit et al., *supra,* at 390, but of course could not be truly double blind because the researchers had to tell the handlers that the red paper markers indicated possible presence of contraband to

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

Because the empirical literature calls into question the ability of drug-detection dogs to give accurate "tips," and raises the real possibility that human cues influence drug-dog reliability, and therefore the veracity of their knowledge, the State must provide the individual dog's track record, including false positives and false negatives, to support issuance of a warrant. For example, see *Jackson,* 102 Wn.2d 432 at 437 ("The most common way to satisfy the 'veracity' prong is to evaluate the informant's 'track record,' i.e., has he provided *accurate information* to the police a number of times in the past?" (Emphasis added)).

G.    Empirical Research Demonstrates that Dog Sniff Searches of People of Color Produce Disproportionately High False Positives When Compared to Searches of Whites.

Washington courts, as well as the Ninth Circuit, have come to understand that all people harbor implicit biases – and handlers, who might cue their dogs

---

test the hypothesis that handler belief affected whether the dog would alert. Another court noted that "the conclusions of this study have not been unanimously accepted[,]" *United States v. Guyton,* No. 11-271, 2013 WL 2394895 at *7-8 (E.D. La. Apr. 16, 2013), citing as an example a responsible article that purported to identify a number of flaws in the study. That two-page article – self-published online and without peer review – did not identify limitations in the study that Dr. Lit had not already forthrightly acknowledged. *Compare* Scientific Working Group on Dog and Orthogonal Detector Guidelines (SWGDOG), *SWGDOG Membership Commentary on "Handler beliefs affect scent detection dog outcomes" by L. Lit, J.B. Schweitzer and A.M. Oberbauer* (Mar. 31 2011), http://swgdog.fiu.edu/news/2012/swgdog-response-to-lit-k9-study/swgdog_response_to_lit_study.pdf., *with* Lit et al., *supra,* at 393.

MOTION TO SUPPRESS - 14

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

based on these biases, intentionally or unintentionally, are no exception. *See State v. Saintcalle,* 178 Wn.2d 34, 46-49 (2013) (plurality opinion) (highlighting studies on implicit racial bias and their importance in informing the debate about reforming the peremptory challenge system). The Ninth Circuit has recognized the effect of implicit racial bias specifically in the Fourth Amendment traffic stop context. *See Gonzalez-Rivera v. INS.,* 22 F.3d 1441m 1449-50 (9th Cir. 1994) (finding a border patrol's decision to stop a vehicle because the passengers appeared to be Hispanic to be an egregious constitutional violation, noting that police "may use racial stereotypes as a proxy for illegal conduct without being subjectively aware of doing so" (citing Charles R. Lawrence III, *The Id, The Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan. L. Rev. 317, 322 (1987)). Weaving together what courts acknowledge about the operation of implicit bias with studies establishing the "handler effect," it is likely that a handler's implicit racial bias – i.e., an officer's subconscious belief that people of color are more like to have contraband in their possession – will negatively affect canine reliability.

Investigative reporters at the Chicago Tribune published an article in 2011 analyzing three years of searches based on dog alerts conducted by suburban police departments outside of Chicago. Dan Hinkel & Joe Mahr, *Drug Dogs Often*

MOTION TO SUPPRESS - 15

*Wrong,* Chi. Trib., Jan 6, 2011. The reporters found that only 44% of all alerts led to the discovery of drugs or paraphernalia. *Id.* Critically, they found the dog sniff searches of Hispanic drivers produced disproportionately high false positive rates; when the data for Hispanic drivers was disaggregated, the success rate was just 27%. *Id.*[6] Stated differently, drug-detection dogs had a false positive rate of 56% overall and a 73% false positive rate when Hispanic motorists were subjected to a dog sniff search.

After the Chicago Tribune article was published, a report by the ACLU of Illinois confirmed that data collected on dog sniff searches revealed there was "a substantial racial disparity in erroneous dog alerts." ACLU of Illinois, *Racial Disparity in Consent Searches and Dog Sniff Searches,* at 7 (Aug. 13, 2014), https://www.aclu-il.org/en/publications/racial-disparity-consent-searches-and-dog-sniff-searches. When comparing white motorists and Hispanic motorists who were

---

[6] The success rate for Blacks was 46%, and for Caucasian 49%. Hinkel & Mahr, *supra.* The article did not explain or otherwise hypothesize why the success rates for Blacks and Hispanics differed so notably. *See id.* The Chicago Police Department did not report any data. *Id.* When the data was disaggregated for the individual departments who had the highest numbers of total dog sniff searches, it showed more significant disparities in alert accuracy between Hispanic and non-Hispanic drivers. Hinkel & Mahr, *supra.* For instance, McHenry County data showed that 32 percent of the 103 searches based on dog alerts led to the finding of drugs or paraphernalia, with searches on Hispanic drivers turning up drugs in only 1 of the 12 stops, for a rate of 8 percent. *Id.*

MOTION TO SUPPRESS - 16

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

subjected to dog sniff searches, white motorists were 64% more likely than Hispanic motorists to be found with contraband. *Id.* at 8. It is plausible to surmise that the higher rate of false positives for Hispanic drivers might stem at least in part from handler cues, especially when the initial decision to conduct a dog sniff search may itself be the result of bias, explicit or otherwise, on the part of either the handler, other officers who make the initial decision to deploy the dog, or both.[7]

H.    Argument and Bases Why the Pretextual Search and Seizure of Mr. O'Mealy's Car Violated the Law, and All Fruits of that Seizure Should Be Suppressed.

Once the dog's fallibility is recognized, that ends the justification claims in place of treating the sniff as *sui generis* under the Fourth Amendment: the sniff alert does not necessarily signal hidden contraband and opening the container or closed space whose emanations the dog has sensed will not necessarily reveal contraband or any other evidence of crime. The point is the sniff and alert cannot claim the certainty that the *Place* court assumed, both in treating the deliberate use

---

[7]    Scholars have observed how the use of drug-detection dogs contributes to the disproportionate impact on people of color in the civil forfeiture context. *See, e.g.,* Leslie A. Shoebotham, *Off the Fourth Amendment Leash: Law Enforcement Incentives to Use Unreliable Drug-Detection Dogs,* 14 Loy. J. Pub. Int. L. 251, 266-274 (2012); *see also* R.C.W. 69.50.505(7) (allowing law enforcement to use or sell forfeited property).

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

of sniffing dogs as *sui generis* and then talking about the characterization as a reason to say they are not searches subject to the Fourth Amendment scrutiny. *United States v. Place,* 462 .S. 696 (1983). In Mr. O'Mealy's case before this Court, the stop was a two-day planned pretextual. The stop that they made was not based on probable cause. It was only after the pretext stop pretextual that police had a dog go around and allegedly sniff the car as a supported basis for the search of the car. This was an illegal search and not reasonable.

Dog sniffs are conducted to obtain information about the contents of private spaces beyond anything human senses can perceive, even when conventionally enhanced. The information is not provided by independent third parties beyond the reach of constitutional limitations but gathered by the government's own officers in order to justify searches of the traditional sort, which may or may not reveal evidence of crime but will disclose anything meant to be kept private in the area searched. Thus, the practice of the government's use of a trained narcotics dog functions as a limited search to reveal undisclosed facts about private enclosures, to be used to justify a further and complete search of the enclosed area. And given the fallibility of the dog, the sniff is the first stop in a process that may disclose "intimate details" without revealing contraband, just as a thermal imaging device

MOTION TO SUPPRESS - 18

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

might do as described in *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), [125 S.Ct. 841].

It makes sense then, especially in this case, to treat the sniff as the search that it amounts to in practice, and to rely on the body of our Fourth Amendment cases, including *Kyllo,* in deciding whether such a search is reasonable. Here, not only is it not reasonable, but it is the product of a pretextual to stop the car in order to search by using the dog. As a general proposition, using the dog to sniff for drugs is subject to the rule that the object of enforcing criminal laws does not, without more, justify suspicion-less Fourth Amendment intrusions. *See Indianapolis v. Edmond,* 531 U.S. 32, 41-42, 121 S.Ct. 477, 148 L.Ed.2d 333 (2000). The search in this case must stand or fall on its being ancillary to the pretextual traffic stop which was used that led up to using the dog. It is not true that the police had probable cause to stop the car for an offense that was committed in the officers' presence. If so, that may have justified the stopping of the car. There is no occasion to consider any authority incident to arrest, however (*See Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), for the police did nothing more than to detain a citizen long enough to check his record and write the ticket. The reasonableness of the search must be assessed in relation to the actual delay the police chose to impose. As Justice Ginsberg points out in

MARK E. VOVOS, P.S.
Attorneys At Law
2721 S. Pittsburg
Spokane, WA 99203
(509) 326-5220

her opinion, *post 844,* "The Fourth Amendment consequences of stopping for a traffic citation are settled law."

## **CONCLUSION**

Based on the facts of this case, the officers illegally stopped Hunter Bow O'Mealy based on a planned pretextual stop prior to the actual stop and seizures of his vehicle. Furthermore, without agreeing to the foregoing, even if the stop of Hunter Bow O'Mealy's vehicle would have been proper, the officers prolonged the stop far beyond what is considered reasonable. The officers were intent on having the dog sniff the vehicle for drugs despite there being no probable cause to stop the vehicle based on what the officers had observed.

For all the reasons mentioned herein, Hunter Bow O'Mealy respectfully requests the Court for an evidentiary hearing and suppression of all evidence seized from the automobile of Mr. O'Mealy on August 18, 2021, as well as any statements to law enforcement. *See Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963), holding that all evidence obtained as fruits of a Fourth Amendment violation must be suppressed, including statements.

MOTION TO SUPPRESS - 20

DATED this 8th day of April, 2022.

_s/ Mark E. Vovos, #4474_
Attorney for Hunter Bow O'Mealy
2721 S. Pittsburg
Spokane, WA 99203
Phone: (509) 326-5220
E-mail: mvovos@mvovos.digitalspacemail8.net

MOTION TO SUPPRESS - 21

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Sandy D. Baggett                     Attorney for Defendant
Attorney at Law                      Caleb Ryan Carr
170 S. Lincoln Street, Suite 150
Spokane, WA 99201
646-714-7984
sdbaggett@hotmail.com

David R. Partovi                     Attorney for Defendant
Partovi Law                          Matthew Gudino-Pena
900 N. Maple, LL
Spokane, WA 99201-1807
509-270-2141
davepartovi@gmail.com

Richard R. Barker                    Attorney for Plaintiff
U.S. Attorney's Office               United States of America
P.O. Box 1494
Spokane, WA 99210-1494
509-353-2767

Stephanie A. Van Marter              Attorney for Plaintiff
U.S. Attorney's Office               United States of America
P.O. Box 1494
Spokane, WA 99210-1494
509-353-2767

                    _s/ Mark E. Vovos, #4474_
                    Attorney for Hunter Bow O'Mealy
                    2721 S. Pittsburg
                    Spokane, WA 99203
                    Phone: (509) 326-5220
                    E-mail: mvovos@mvovos.digitalspacemail8.net

MOTION TO SUPPRESS - 22