Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Stephanie Van Marter
Richard R. Barker
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 24, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HUNTER BOW O'MEALY,<br><br>Defendant. | Case No. 2:21-CR-00142-TOR-1<br><br>Rule 11(c)(1)(C)<br>Plea Agreement |

The United States of America, by and through United States Attorney Vanessa R. Waldref and Assistant United States Attorneys Stephanie Van Marter Richard R. Barker and Defendant Hunter Bow O'Mealy (hereafter "Defendant"), both individually and by and through Defendant's counsel, Mark Vovos, agree to the following Plea Agreement.

1.  Guilty Plea, Maximum Statutory Penalties, and Supervised Release

Defendant agrees to plead guilty to Count 1 of the Superseding Indictment dated November 2, 2021, charging Defendant with Conspiracy to Distribute 400 Grams or More of Fentanyl in violation of 21 U.S.C.§§ 841(a)(1), (b)(1)(A)(vi), 846, a Class A felony.

Defendant understands the following potential penalties apply:

a.  a term of imprisonment of not less than 10 years and up to life;

b.  a term of supervised release of not less than 5 years and up to life;

c.  a fine of up to $10,000,000; and

d.  a $100 special penalty assessment.

Defendant understands that a violation of a condition of supervised release carries an additional penalty of reimprisonment for all or part of the term of supervised release without credit for time previously served on post release supervision.

2.     The Court is Not a Party to the Agreement

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant understands the following: sentencing is a matter solely within the discretion of the Court; the Court is under no obligation to accept any recommendations made by the United States or Defendant; the Court will obtain an independent report and sentencing recommendation from the United States Probation Office; and the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties.

Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands that the Court is required to consider the applicable range under the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances.

3.     Rule 11 Nature of the Plea Agreement

Defendant acknowledges that this Plea Agreement is entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) ("Rule 11(c)(1)(C)"). Pursuant to Rule 11(c)(1)(C), the United States and Defendant agree that the appropriate disposition of the case falls within a range of 168 – 240 months' custody, to be followed by a period of Supervised Release. The United States and Defendant agree to make sentencing recommendations within this range to the Court. Although the United States and Defendant agree to make these recommendations to the Court pursuant to Rule

11(c)(1)(C), Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will ultimately impose.

Defendant understands that Defendant may withdraw from this Plea Agreement if the Court imposes a term of imprisonment of greater than 240 months' custody or indicates its intent to do so. Defendant also understands that the United States may withdraw from this Plea Agreement if the Court imposes a term of imprisonment of less than 168 months, or a term of supervised release of less than five years, or indicates its intent to do so.

Defendant and the United States acknowledge that the imposition of any fine, or conditions of Supervised Release are not part of the Rule 11(c)(1)(C) nature of this Plea Agreement. Subject to the provisions set forth in this Plea Agreement, the parties are free to make any recommendation they deem appropriate as to the imposition of a fine or conditions of Supervised Release; and that the Court will exercise its discretion in this regard. Defendant and the United States acknowledge that the Court's decisions regarding the imposition of a fine, or conditions of Supervised Release will not provide a basis for Defendant to withdraw Defendant's guilty plea or withdraw from this Rule 11(c)(1)(C) Plea Agreement.

Defendant acknowledges that if either Defendant or the United States successfully withdraws from this Plea Agreement, the Plea Agreement becomes a nullity, and the United States is no longer bound by any representations within it.

4.     Denial of Federal Benefits

Defendant understands that by entering this plea of guilty, Defendant is no longer eligible for assistance under any state program funded under part A of Title IV of the Social Security Act (concerning Temporary Assistance for Needy Families) or benefits under the food stamp program or any state program carried out under the Food Stamp Act.   21 U.S.C. § 862a. Defendant also understands that the Court may deny Defendant's eligibility for any grant, contract, loan, professional license, or commercial

license provided by an agency of the United States or by appropriated funds of the United States. 21 U.S.C. § 862.

5.   Effect on Immigration Status

Defendant understands that pleading guilty may have consequences with respect to Defendant's immigration status if Defendant is not a citizen of the United States. Defendant understands that a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty. Defendant understands that removal and other immigration consequences are the subject of separate proceedings. Defendant understands that while removal from the United States may be a result of Defendant's guilty plea if Defendant is not a citizen of the United States, no one, including Defendant's attorney or the District Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status. Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail, even if removal from the United States is a virtual certainty if Defendant is not a United States citizen.

6.   Waiver of Constitutional Rights

Defendant understands that by entering this guilty plea, Defendant is knowingly and voluntarily waiving certain constitutional rights, including the following:

      a.   the right to a jury trial;

      b.   the right to see, hear and question the witnesses;

      c.   the right to remain silent at trial;

      d.   the right to testify at trial; and

      e.   the right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands that Defendant retains the right to be assisted by an attorney through the sentencing proceedings in this case and any direct appeal of Defendant's conviction and sentence,

1 and that an attorney will be appointed at no cost if Defendant cannot afford to hire an
2 attorney.

3    7.    Elements of the Offense

4    The United States and Defendant agree that in order to convict Defendant of
5 Conspiracy to Distribute 400 Grams or More of Fentanyl in violation of 21 U.S.C. §§
6 841(a)(1), (b)(1)(A)(vi), the United States would have to prove the following beyond a
7 reasonable doubt:

8       *First*, beginning on a date unknown but by May 2021 and continuing until on or
9       about October 15, 2021, in the Eastern District of Washington and elsewhere,
        Defendant entered into an agreement with one or more persons to commit the
10      crime of Distribution of Fentanyl, as charged in the Superseding Indictment;

11      *Second*, Defendant became a member of the conspiracy knowing of at least one
12      of its objects and intending to help accomplish it; and

13      *Third*, the agreement was to distribute 400 Grams or More of Fentanyl, which
14      would be reasonably foreseeable to her as a member of the conspiracy.

15    8.    Factual Basis and Statement of Facts

16    The United States and the Defendant agree and stipulate the United States could
17 prove these facts beyond a reasonable doubt at trial; and these facts constitute an
18 adequate factual basis for Defendant's guilty plea. The parties acknowledge there may
19 be global facts pertaining to the overall conspiracy included within this factual
20 statement to which the Defendant may not have personal knowledge. However, the
21 Defendant agrees and stipulates that the facts as they pertain directly to his involvement,
22 are accurate. This statement of facts does not preclude either party from presenting and
23 arguing, for sentencing purposes, additional facts which are relevant to the guideline
24 computation or sentencing, unless otherwise prohibited in this agreement.

25    The United States and Defendant stipulate and agree to the following: the facts
26 set forth below are accurate; the United States could prove these facts beyond a
27 reasonable doubt at trial; and these facts constitute an adequate factual basis for
28 Defendant's guilty plea.

Beginning on a date unknown, but by May 2021, MATTHEW GUDINO-PENA (A/K/A "CHEESY"), HUNTER BOW O'MEALY, CALEB RYAN CARR, JAMIE BELLOVICH, a CONFIDENTIAL SOURCE, and others are part of a drug conspiracy to distribute 50,000+ fentanyl pills in Eastern Washington and elsewhere. The group identified themselves as the "Fetty Brothers," and distributed other drugs to include cocaine, LSD and marijuana. The investigation also identified a at least one violent crime perpetrated in furtherance of their drug trafficking activities. There also has been at least one overdose death linked to drugs supplied, at least in part, by the Fetty Brothers Drug Organization. A detailed account of the conspiracy is set forth below.

<u>Overdose Death and Homicide in Northern Idaho</u>

The investigation in this case began as a result of an overdose death and shooting in Idaho involving fentanyl. In May 2021, in Coeur D'Alene, Idaho, a juvenile victim, who was a high school freshman, was pronounced dead due to a fentanyl overdose. DEA's investigation identified the likely supplier as Matthew Holmberg, who used the SnapChat moniker "pac.man2021." During the investigation into the overdose, Holmberg and an associate, Dennen Fitterer-Usher, were implicated in the shooting death of Gabriel Casper on May 31, 2021 in Coeur D'Alene. In statements to law enforcement, both Holmberg and Fitterer-Usher admitted they shot Casper during a drug deal gone bad. Specifically, Holmberg and Fitterer explained they met up with Casper and another individual to sell counterfeit oxycodone hydrochloride pills, laced with fentanyl. During the meeting, however, Casper and the individual pulled guns on Holmberg and Fitterer-Usher. At this point, Fitterer-Usher opened fire. Holmberg and Fitterer-Usher are currently in custody pending numerous charges in the District of Idaho.

<u>Identifying Members of the Conspiracy</u>

During the Idaho investigation into the shooting and overdose death referenced above, law enforcement identified a source, who directly supplied Holmberg and

Fitterer-Usher's with Fentanyl-laced pills. Based on the information from a CD, as well as a suspicious history at the source's residence of packages coming from a fake address in Tacoma, Washington, the DEA and the U.S. Postal Inspection Service (UPSIS) obtained and executed a search warrant of the source's home on July 30, 2021. While executing the search warrant, DEA recovered thousands of blue counterfeit oxycodone hydrochloride pills, laced with fentanyl. That source of supply (hereafter the "CS") admitted to being Holmberg's primary source of supply.

When asked who was supplying fentanyl to the CS, the CS indicated that his/her primary sources of supply were O'MEALY and CARR, who traveled from Tacoma to Spokane to deliver pills. The CS reported that O'MEALY and CARR also sent pills to him/her through the U.S. Postal Service.[1] In other words, O'MEALLY and CARR were identified as the CS's suppliers. The CS, in turn, was one of the sources of supply for Holmberg and Fitterer-Usher.

The CS provided DEA and the U.S.P.I.S. with information that O'MEALY and CARR were distributing a wide variety of controlled substances to include, cocaine, fentanyl pills, and marijuana. During the investigation, the CS further identified additional co-conspirators that were working with OMEALY and CARR to include GUDINO-PENA (whom the CS did not know well) and BELLOVICH. The CS described BELLOVICH's primary role in the conspiracy as a driver for O'MEALY and CARR. The CS reported that O'MEALY and CARR, on average, would supply approximately 1,000 – 2,000 Fentanyl-laced pills approximately every two weeks to the CS. Although the CS did not sell cocaine, the CS knew based upon his involvement, that O'MEALY and CARR sold at least 1-2 kilograms of cocaine each month.

_____

[1] The CS, who has no criminal history, agreed to cooperate in consideration of pending federal charges stemming from their involvement in this overall Conspiracy. Based upon the CS' cooperation, he/she has been threatened. The CS has also received consideration in the form of relocation assistance from DEA and the US Attorney's office.

The CS explained that O'MEALY, CARR, and their co-conspirators also utilized firearms in connection with their drug trafficking activities. The CS stated that O'MEALY and CARR owned a business that reportedly advertised the sale of designer clothes but indicated that most of their income was derived from the sale of the drugs, guns, and switches that make firearms fully automatic. The CS identified numerous locations that O'MEALY and CARR utilized in the Tacoma area to include residences and a storage unit.

The CS reported that O'MEALY and CARR had engaged in certain violent actions in furtherance of their drug organization, including that O'MEALY pulled a gun on the CS because the CS was once short on money.

As part of his cooperation, the CS recorded a number of snapchat videos, which were provided to DEA. In these videos and related messages, O'MEALY and CARR are advertising drugs and carrying guns. By way of example, on or about August 12, 2021, O'MEALY posted a video on Snapchat with a large assortment of firearms. O'MEALY planned on selling the firearms to have enough money to obtain larger quantities of controlled substances. The video depicts numerous handguns and assault style rifles.

GUDINO-PENA also appeared in various snap chat videos, including in videos where GUDINO-PENA was firing what appears to be fully automatic firearms. Specifically, pursuant to a search warrant, DEA obtained videos from CARR's Snapchat account in which GUDINO-PENA is shooting a gun – i.e., in videos dated around August 11 – August 13. One video appears with the following caption, identifying GUDINO-PENA by his nickname: "Cheesy knock your head off like a (watermelon emoji)."

<u>August 18, 2021 Traffic Stop in Chehalis, Washington</u>

On August 10, 2021, DEA met with the CS, who informed DEA TFO Tim Snell that O'MEALY and CARR would be traveling to Arizona on August 11, 2021 to "re-

up" – i.e., to obtain additional drugs for distribution – and would be in the Spokane area Saturday or Sunday that week. A few days later, on August 15, 2021, the CS provided DEA with a Snapchat video depicting CARR preparing to board an airplane with a small red bag. The CS forwarded TFO Snell a voicemail from CARR in which he talked about his travel plans and needing to be back in Tacoma for a "play" for half a "brick" (drug slang the CS knows to mean the sale of half a kilogram of cocaine).

On August 17, 2021, the CS told DEA that O'MEALY was headed back to Tacoma. TFO Snell monitored geo-location information from O'MEALY's phone, which had been obtained pursuant to a search warrant, and observed movement back west towards California on the evening of August 17, 2021. Overnight and into August 18, 2021, the geolocation information showed O'MEALY moving north through California. On August 18, 2021, O'MEALY was stopped while driving a maroon-colored Honda Insight on Interstate 5 by DEA Joint Narcotics Task Force (JNET) near Chehalis, Washington.

GUDINO-PENA was in a separate vehicle, which accompanied O'MEALY'S Honda Insight. GUDINO-PENA's vehicle and O'MEALY's Honda appeared to be moving in tandem and were very close to one another. During the traffic stop, and after obtaining a search warrant on the two vehicles, DEA recovered approximately 40,000 Fentanyl laced pills and $16,300 in US currency from inside the Honda Insight. Several firearms were recovered from inside the vehicle in which GUDINO-PENA was traveling. The pills were sent to the DEA lab.

In messages obtained from the CS, CARR made statements to the effect that GUDINO-PENA and those traveling with him were providing support to O'MEALY for transporting the fentanyl-laced pills on August 18, 2021. A video later obtained from CARR's iPhone appears to depict GUDINO-PENA and others with bags containing suspected counterfeit oxycodone hydrochloride pills in what appears to be a hotel room on August 3, 2021.

August 24, 2021 Controlled Buy in Spokane, Washington

On August 23, 2021, at the direction of TFO Snell and DEA SA David Clyde, the CS contacted CARR and O'MEALY to order 2,000 fentanyl laced pills. CARR said he would be traveling to Spokane on August 24, 2021 and would have a girlfriend drive him. CARR claimed because of the recent traffic stop involving O'MEALY, CARR was being extra cautious.

On August 24, 2021 the CS and CARR agreed to meet in the parking lot of a restaurant located near downtown Spokane, Washington. Based on this information, DEA Surveillance units set up in the area. CARR said he would be in a white Kia with no front bumper. When he arrived, CARR directed the CS to come to him. Surveillance observed the white Kia parked across the street to the north of the restaurant. The registration on the white Kia returned to BELLOVICH from Tacoma, Washington. The CS entered the white Kia and conversed with CARR, who was in the front passenger seat. A female, who later was identified as BELLOVICH, was in the driver seat.

During the controlled buy, CARR handed the CS a pillowcase containing approximately twenty pounds of marijuana candy and 2,000 suspected Fentanyl laced pills. Along with the controlled substances, CARR handed the CS five iPhones and a new pre-paid Straight Talk branded flip phone. CARR and O'MEALY believed the CS had computer expertise and could make the phones invisible to law enforcement. CARR asked the CS to begin working on CARR's blue iPhone 12 first.

Although O'MEALY was not present for the delivery of these drugs, he collected money for the drugs from the CS about two weeks later.

Extraction of CARR's iPhone 12

Rather than make the iPhones invisible, the CS gave the 5 phones to DEA. On August 31, 2021, DEA successfully extracted CARR's blue iPhone 12 upon execution of a search warrant. The phone extraction provided law enforcement with extensive information regarding the sale of controlled substances and other unlawful activities

involving members of the conspiracy. By way of example, information retrieved from the extraction of CARR's iPhone 12 provided law enforcement with BELLOVICH's phone number, which had a car emoji in as part of BELLOVICH's contact information. The search also identified a number of CARR's texts regarding the use of storage units to distribute controlled substances. In one message string, with an unidentified female who described herself as "the girl from public storage," the female asks CARR for "some blues, but also wanted a good deal on them, if possible." In another message thread, dated July 2, 2021, CARR told O'MEALY he was going to "leave all this money in 802" – a reference to a storage unit they were renting.

### CARR, O'MEALY, and BELLOVICH's September 2021 Trip to Spokane, North Carolina, and Arizona

On September 6, 2021, CARR and O'MEALY told the CS they planned on traveling to North Carolina to attend a concert. The next day, the CS informed DEA that CARR and O'MEALY would be passing through Spokane on their way east. As part of this trip, CARR and O'MEALY requested the CS provide payment for the previous delivery of 2,000 suspected fentanyl laced pills and marijuana candy obtained from CARR and BELLOVICH on August 24, 2021. CARR and O'MEALY met the CS at the parking lot for a hotel in Spokane Valley, Washington. DEA put surveillance in place and observed a gold Honda Accord pull into the lot and park next to the CS's car. The CS got out of his vehicle, and met CARR, O'MEALY, and BELLOVICH next to the Honda Accord. At this point, the CS gave CARR a Walmart bag containing $3,000. Also in the bag was the pre-paid Straight Talk branded flip phone CARR gave to the CS on August 24, 2021 to make invisible. DEA Task Force Officers were in a vehicle near the CS and watched the interactions between the CS, CARR, O'MEALY, and BELLOVICH. DEA agents were able to positively identify CARR and O'MEALY. The CS later confirmed that the female was BELLOVICH – i.e., the same woman who traveled with CARR on August 24, 2021.

Using geolocation data for CARR's phone, TFO Snell observed CARR travel across the northern United States. By September 10, the pings were in the area of Raleigh, North Carolina. On September 11, 2021 the pings were moving west across the southern portion of the United States. Then, on September 12, 2021 the pings arrived in the area of Tucson, Arizona. The next day, the CS advised TFO Snell that CARR and O'MEALY obtained yachts (yacht is drug slang for 10,000 pills) in the desert from a Mexican source. Then, on September 14, 2021, the CS advised TFO Snell that CARR and O'MEALY were running illegal aliens and were posting information on Snapchat to recruit additional drivers.

Over the next few days, O'MEALY and BELLOVICH returned to Tacoma. CARR, however, stayed in Arizona because he reportedly had been assaulted and robbed near the Mexican border by someone CARR believed to be associated with a Mexican cartel. CARR reported that he had bruised or broken ribs and apparently wasn't well enough to travel.

Shipment of Additional Narcotics from Tacoma to Spokane on September 21, 2021

On September 18, 2021, the CS told TFO Snell that O'MEALY and CARR wanted to ship suspected fentanyl-laced pills to the CS in Spokane. As part of this transaction, the CS was supposed to ship $4,500 to $5,000 by overnight USPS mail and, in return, O'MEALY would have a "runner" ship two or three boats of pills (2,000 – 3,000) to the CS.

On September 20, 2021, TFO Snell, SA Clyde and USPIS Inspector Shannon Saylor met with the CS to complete a shipping label in preparation for the shipment of $5,000 to a mailbox in Tacoma associated with CARR and O'MEALY'S business. The CS then advised TFO Snell and SA Clyde that O'MEALY would ship the pills upon receipt of a tracking number for the shipment containing the $5,000. The CS then sent a photograph of the tracking receipt to O'MEALY. The next day, O'MEALY sent a picture of shipping receipt for the drugs. Video obtained from the post office in Tacoma

1  shows BELLOVICH shipping the package. Ultimately, USPIS Inspector Shannon
2  Saylor collected the package. Inside the package, there were approximately 2,000
3  fentanyl-laced pills.

4             Shooting of Trequan Morton by GUDINO-PENA and O'MEALY

5         On September 25, 2021, CARR told the CS about a shooting involving
6  O'MEALY and GUDINO-PENA. After the shooting, O'MEALY contacted CARR,
7  who was in Arizona, and described O'MEALY and GUDINO-PENA's involvement.
8  CARR then communicated with the CS about the shooting. Later that day, the CS
9  forwarded a text string to DEA between the CS and CARR. The text messages indicated
10 that a shooting occurred "last night" and involved O'MEALY catching the person who
11 was snitching on them. CARR messaged that the shooting was "outside the studio" in
12 Lakewood, Washington. CARR further messaged that someone named "tre" was shot
13 and his lung was collapsed. CARR added that GUDINO-PENA was with O'MEALY
14 during the shooting.

15        When DEA learned about the shooting, SA Clyde reached out to the Lakewood
16 Police Department (LPD) to verify the information from the CS. SA Clyde confirmed
17 that a shooting had indeed occurred on Friday night or early Saturday morning around
18 midnight outside of a recording studio. LPD Detective Jeffery Martin told SA Clyde
19 that video showed two shooters exiting a black Lexus with black rims firing about 40
20 shots in 8 seconds. Detective Martin confirmed the victim's name to be Tre Morton,
21 who was then in the hospital with spinal damage. According to hospital personal,
22 Morton likely will be paralyzed from the waist down as a result of the shooting. Morton
23 reported to police that if the car was a black Lexis, then O'MEALY was involved in the
24 shooting.

25        On September 27, 2021, the CS contacted DEA about a conversation he had with
26 O'MEALY on a recorded video call over Snapchat. In the recording, the CS asked
27 O'MEALY if "bro" (reference to Tre) was going to pull through. O'MEALY responded
28

that Tre got hit in the lung, went out the back and hit him in the vertebrate shattering Tre's spine. O'MEALY explained that Tre may not be able to walk again and was critical. O'MEALY said Tre would not be able to "Remember shit" because "he didn't see shit," and there were other people with him. The CS asked whether O'MEALY hit anyone else. O'MEALY responded that he did not. The CS asked how O'MEALY knew where Tre was, and O'MEALY responded that Tre posted his location on "Snap." O'MEALY explained that when he saw the location on "snap," he said, "let's go." In separate communications between the CS and CARR, CARR stated that he suspected Tre of being a "snitch."

<u>September 26, 2021 Traffic Stop of BELLOVICH</u>

In late September 2021, TFO Snell and SA Clyde obtained location information for BELLOVICH's phone pursuant to a search warrant. On the morning of September 26, 2021, TFO Snell observed BELLOVICH traveling from Los Angeles toward Sacramento. By the morning of September 27, 2021, TFO Snell and SA Clyde showed BELLOVICH traveling north on Interstate 5 near Longview, Washington. SA Clyde asked area law enforcement to attempt to locate, stop, and contact BELLOVICH.

At approximately 9:25 a.m., BELLOVICH reached mile post 74 on Interstate 5 in the same gold Honda she drove through Spokane a few weeks earlier with O'MEALY and CARR. Law enforcement stopped the Honda after observing a number of traffic violations. During a driver's license check, police asked BELLOVICH about weapons and controlled substances in the Honda. BELLOVICH responded that there were no guns, but there was cocaine, fentanyl, LSD, and pharmaceuticals in her bags. BELLOVICH verbally consented to a search of the Honda, which revealed a grocery bag containing about 6,000 suspected fentanyl laced pills with the imprint of M/30, a small sandwich bag containing approximately 36 additional pills imprinted with M/30, 26 "Farmapram" bottles, each labeled as "Alprazolam" 90 count, a large Ziploc style bag containing a white power, which later tested positive for cocaine, a sheet of pyramid

1  gel tabs wrapped in foil with approximately 1000 doses of LSD. BELLOVICH also
2  admitted to having cocaine in her purse.

### O'MEALY and CARR's Threats to BELLOVICH

4      BELLOVICH was placed under arrest and booked on Washington State charges.
5  On September 29, 2021, CARR contacted the CS and told him BELLOVICH posted
6  bond using a residence as collateral. CARR was suspicious that BELLOVICH was able
7  to get out of jail so quickly. CARR then told the CS that if BELLOVICH cooperates
8  with law enforcement CARR would kill her. Later that same morning, O'MEALY
9  contacted the CS and repeated the same concerns as CARR about BELLOVICH
10 bonding out quickly. O'MEALY then added they would "pop" – i.e., kill –
11 BELLOVICH if needed.

### Execution of Warrants on September 30, 2021 and October 13, 2021

13     On September 30, 2021, DEA executed a series of search warrants on CARR and
14 O'MEALY's residence in Eatonville, Washington and storage units in Tacoma,
15 Washington. DEA seized additional pills suspected to be laced with fentanyl. They
16 also seized several firearms as well as a several thousands of dollars of merchandise
17 from the storage units believed to have been purchased with money obtained from the
18 distribution of illegal narcotics.

19     Almost immediately after the execution of the search warrants, DEA stopped
20 receiving geolocation data for O'MEALY's phone – which DEA was had obtained
21 pursuant to yet another search warrant. On October 1, 2021, the CS reported to TFO
22 Snell that O'MEALY had "snapped sim" and "tossed phone." In another message,
23 CARR told the CS that he (CARR) was working on getting O'MEALY out of the
24 Tacoma area and wanting the CS to create new identities. Around this time, the CS
25 reported to TFO Snell that the CS received a new number for O'MEALY, who, again,
26 had snapped his old phone after DEA executed a number of search warrants in western
27 Washington.

28

After learning of the new telephone number, TFO Snell requested that the CS call the new number and record the conversation with O'MEALY. In a recording provided by the CS, O'MEALY stated that his door was kicked in at the house and the storage units. O'MEALY told the CS all the clothes in the storage unit were gone. In the recorded call, O'MEALY added "they" (Law Enforcement) took all of CARR's guns and ammo, their computer and O'MEALY's Rolex. In this conversation, O'MEALY asked if his phone (an iPhone provided to the CS during the August 24, 2021 transaction for 2,000 pills with CARR and BELLOVICH) was ready, and the CS responded that it was. O'MEALY then explained he would provide an address in Arizona of where to ship it. As noted above, O'MEALY previously has conversed with the CS about making his phone invisible to law enforcement.

On October 4, 2021, O'MEALY sent information to where he wanted the phone shipped, specifying the following address: Jon Mayer at 1011 N Tyndall Avenue Room 509, Tucson, Arizona. At this point, TFO Snell purchased a Straight Talk Wireless iPhone from Walmart and accompanying pre-paid data/phone plan on October 5, 2021. Upon activation, a new telephone number was assigned. TFO Snell linked the Apple iCloud account established on the new telephone number to a non-attributable undercover iPhone under the "Find My" family sharing feature, which provided real time GPS location information accessible through the undercover iPhone. The Find My feature could be toggled on or off by the user of the iPhone – i.e., O'MEALY could deactivate the "find my" feature upon receipt of the phone.

On October 5, 2021, the CS reported to TFO Snell that O'MEALY was in Los Angeles and would be in Arizona in the next three days. O'MEALY said they would be staying with "Jon" until they received new identities from the CS. O'MEALY told the CS he also needed a new identity for "Cheesy" – i.e., GUDINO-PENA (though the CS does not know GUDINO-PENA's real name). TFO Snell was able to listen to recordings of these calls, which appeared to capture GUDINO-PENA talking in the

background of the call, and, at some points, interrupting the call. Based on his conversations with O'MEALY and CARR, the CS stated that GUDINO-PENA was giving O'MEALY a ride from Washington to Arizona.

On October 8, 2021, TFO Snell sought and obtained a search warrant to monitor geolocation information for the iPhone requested by O'MEALY, and the phone was delivered pursuant to O'MEALY's instructions. TFO Snell also requested a geo-location warrant for a phone number identified as belonging to GUDINO-PENA. After the delivery of O'MEALY's phone, TFO Snell observed that the iPhone was located in the area around 1011 N Tyndall Avenue in Tucson, Arizona. The geo-location data for GUDINO-PENA's put GUDINO-PENA in this same area, though the location data was not as precise.

On October 11, 2021 at approximately 5:00 p.m., TFO Snell observed that geolocation information was no longer available for CARR's prior telephone number. Around this time, CARR contacted the CS and informed the CS that CARR's Snapchat account had been blocked. CARR, therefore, changed his telephone number in an attempt to create a new SnapChat account. Around this time, CARR sent the CS his new telephone number. After getting the new telephone number from the CS, DEA SA Jon T. Wiseman sought and obtained a search warrant for geolocation data for CARR's new phone.

On October 13, 2021, DEA Special Agent Clyde, along with a team from the U.S. Marshals and U.S.P.I.S. apprehended O'MEALY at 1011 N Tyndall Avenue, Tucson, Arizona. At the time he was arrested, O'MEALY was in the gym of the apartment complex with GUDINO-PENA.

CARR, who informed the CS he had left the night before, was not arrested at 1011 N. Tyndall. According to the CS, CARR was on his way back to 1011 N Tyndall Avenue, Tucson, Arizona, when CARR received a cell phone picture of police activity in the area near 1011 N. Tyndall Avenue, Tucson, Arizona. CARR told the CS he fled

1   the area, but continued to be in touch with the CS utilizing the new phone number
2   CARR procured two days earlier.
3        Following O'MEALY'S arrest, DEA Special Agent Clyde along with USPIS
4   Inspectors Shannon Saylor and Jennifer Hiland and others executed a search warrant at
5   1011 N Tyndall Avenue, Tucson, Arizona, which, according to the CS and geolocation
6   data – is where CARR, O'MEALY, and GUDINO-PENA were staying in the days
7   leading up to the execution of the search warrant for 1011 N. Tyndall and the arrest
8   warrant for O'MEALY. Specifically, USPIS, DEA, and ATF agents recovered six
9   firearms from MAYER's bedroom, to include a privately manufactured fully automatic
10   pistol, AK-47 rifle, several rounds of ammunition, a silencer, and a number of
11   rifle/pistol magazines. USPIS also recovered package receipts, a gold money counter,
12   approximately $20,000 U.S. currency, as well as marijuana, cocaine, mushrooms, LSD,
13   and OxyContin from inside the apartment. In a blue Patagonia backpack located in the
14   kitchen of the apartment, DEA and USPIS recovered a Glock 43X firearm and a thirty
15   (30) round extended magazine with ten (10) rounds of ammunition.
16        After O'MEALY'S arrest pursuant to his federal indictment, DEA interviewed
17   GUDINO-PENA.  GUDINO-PENA was advised of his Miranda Rights and agreed to
18   speak to SA Clyde.  During the interview, GUDINO-PENA acknowledged using
19   firearms with O'Mealy and indicated he suspected that the arrest was a result of the
20   August 2021 traffic stop in Chehalis, Washington in which 40,000 fentanyl-laced pills
21   had been recovered.
22        On October 14, 2021, DEA SA Jon T. Wiseman sought and obtained a search
23   warrant for geolocation data for CARR's new phone – which had been identified by the
24   CS. The location data, consistent with information that had been provided to the CS,
25   identified that CARR was located in a motel near Tucson, Arizona.  In messages to the
26   CS, CARR indicated he was with GUDINO-PENA.  Based on the location information,
27   USMS and the DEA were able to apprehend CARR based on the arrest warrant and
28

Indictment. GUDINO-PENA, who was with CARR, was also taken into custody on a complaint.

After his arrest, O'Mealy contacted his mother and directed her to reach out to the CS. O'Mealy's mother in fact contacted the C.S. and requested that the C.S. delete everything on his phone. The C.S. also recorded this conversation.

Evidence and Contraband Seized

During the investigation, the following narcotics evidence was seized by law enforcement:

- *Search Warrant in Airway Heights Washington on July 30, 2021*:
  - DEA Drug Exhibit #1: Blue pills marked "30" and "M," containing approximately 208.3 ggw of Fentanyl, inside a clear plastic Ziploc baggie marked "1K"
  - DEA Drug Exhibit #2: Blue pills marked "30" and "M, containing approximately 84.7 ggw of Fentanyl, inside an amber colored pill bottle
  - DEA Drug Exhibit #3: Marijuana, containing approximately 6.75 gkgw, inside two bags containing leafy plant materials and edibles
- *Traffic Stop/Search Warrant in Centralia Washington on August 18, 2021*:
  - DEA Drug Exhibit #5: Blue pills stamped M30, containing 3,377.3 grams of Fentanyl, inside plastic pill bottles
  - DEA Drug Exhibit #6: Blue pills stamped M30, containing approximately 956.1 grams of Fentanyl, inside Haynes brand socks
- *Controlled buy in Spokane, Washington on August 24, 2021*:
  - DEA Drug Exhibit #7: Blue pills marked "M" and "30," containing approximately 186.9 grams of Fentanyl, inside two Ziploc baggies
  - DEA Drug Exhibits #8-9: Marijuana edibles, weighing approximately 9.4 gkgw
- *Controlled postal delivery to Spokane, Washington on September 23, 2021*:
  - DEA Drug Exhibit #10: Blue pills marked "M" and "30," containing approximately 190.2 grams of Fentanyl, inside a clear plastic zipper bag marked "1K"
- *Seizure on September 27, 2021 in Centralia, Washington*:

- o DEA Drug Exhibit #11: Cocaine containing approximately 224.5 ggw, inside a Ziploc style bag contained inside a black and clear vacuum sealed bag
- o DEA Drug Exhibit #12: White bar pills laced with Benzodiazepine, weighing approximately 592 grams, inside 26 Farmapram bottles
- o DEA Drug Exhibit #13: Blue pills stamped M-30, containing approximately 590.4 grams of Fentanyl, inside a plastic bag
- o DEA Drug Exhibit #14: Cocaine, weighing approximately 30.3 ggw, inside a small, zippered bag
- o DEA Drug Exhibit #15: foil containing LDS, cocaine and THC, weighing 6.3 grams;
- o DEA Drug Exhibit #:16 Blue pills stamped M-30, containing approximately 2.911 grams of Fentanyl, inside a Ziploc style bag
- o DEA Drug Exhibit #23: Marijuana extract, weighing approximately 228.9 ggw, inside five small jars
- • *Seizures on September 30, 2021 in Pierce County Washington Pursuant to Various Search Warrants*:
  - o DEA Drug Exhibit #18: Blue pills, containing approximately 33.2 ggw of Fentanyl, inside a small zipper baggie inside a residence in Eatonville, Washington
  - o DEA Drug Exhibit #19: Marijuana, weighing approximately 558.2 ggw, inside a black and clear plastic bag inside a storage unit in Tacoma, Washington
  - o DEA Drug Exhibit #20: Blue pills marked "M" and "30," containing approximately 7.924 grams of Fentanyl in a small zipper baggie, located in a storage unit in Tacoma, Washington
  - o DEA Drug Exhibit #21: Hashish oil, weighing approximately 1718.1 ggw, inside a Walmart bag containing THC oil vape pen cartridges, located inside a storage unit in Tacoma, Washington

The following firearms were also seized in connection with the DEA and investigation into the Fetty Brothers' drug trafficking organization. While CARR legally purchased certain of these firearms, others were devices/firearms subject to the National Firearms Act:

- Lee-Enfield, bearing serial number: 12579, which was inoperable at the time of seizure
- Benelli SuperNova, bearing serial number Z897898F19
- Stevens Model 320, bearing serial number 151590D
- Poly Technologies AK, bearing serial number: 9069
- Diamondback DB-15, bearing serial number: 1701352
- I.O. Inc. IO-15, bearing serial number: NH0000903
- Smith and Wesson Model M&P 45, bearing serial number: NDL4810
- Eibar Star Firestar, bearing serial number: 1940790
- Glock 48, bearing serial number: BLFS614
- Glock 29, bearing serial number: SCS463
- Smith & Wesson M&P Shield, bearing serial number: JHR6769
- FN 503, bearing serial number: CV014368
- FN 509, bearing serial number: GKS0167979
- Micro Conversion Kit
- Silver firearms suppressor
- 50 magazines of various calibers and manufacturers
- 8 cases of ammunition of various caliber

Based upon the above seizures, the total amounts of drugs seized, not including the application of relevant conduct are as follows: 5,311.74 grams of Fentanyl and an additional 326.2 ggw of Fentanyl, 16.94 gross kilogram weight of marijuana, 1,718.1 gross weight grams of hashish oil, 254.8 gross weight grams of cocaine, and 592 grams weight grams of Benzodizepine.

9. The United States Agrees

The United States Attorney's Office for the Eastern District of Washington agrees that at the time of sentencing, the United States will move to dismiss Counts 2 and 3 of the Superseding Indictment filed on November 2, 2021, which charge

1 Defendant with Distribution of 40 grams or more of Fentanyl in violation of 21 U.S.C.

2 § 841(a)(1), (b)(1)(B)(vi).

3 The United States Attorney's Office for the Eastern District of Washington

4 agrees not to bring additional charges against Defendant based on information in its

5 possession at the time of this Plea Agreement that arise from conduct charged in the

6 Information or the Indictment, unless Defendant breaches this Plea Agreement any time

7 before or after sentencing.

8       10.   United States Sentencing Guideline Calculations

9 Defendant understands and acknowledges that the United States Sentencing

10 Guidelines ("U.S.S.G.") are applicable to this case and that the Court will determine

11 Defendant's applicable sentencing guideline range at the time of sentencing.

12       a.   Base Offense Level and Application of Relevant Conduct:

13 The parties agree the base offense level for Conspiracy to Distribute 400 grams

14 or more of fentanyl is 34. *See* U.S.S.G. §2D1.1(c)(3). The United States and Defendant

15 agree and stipulate that the total drug quantity possessed in furtherance of the criminal

16 activity jointly undertaken by Defendant (and co-conspirators or co-schemers) is as

17 follows: 6,736.1 grams of fentanyl, 16.94 kilograms of marijuana, 1,718.1 grams of

18 hashish oil, 254.8 grams of cocaine, and 2,250 grams of Benzodizepine. These amounts

19 were within the scope of Defendant's agreement; this amount was reasonably

20 foreseeable to Defendant in connection with the conspiracy; and Defendant's relevant

21 conduct for sentencing purposes should be calculated based on this amount, pursuant to

22 U.S.S.G. § 1B1.3.

23       b.   Special Offense Characteristics

24 The United States and Defendant agree that Defendant's base offense level is

25 increased by 2-levels because a dangerous weapon was possessed in connection with

26 the offense. *See* U.S.S.G. § 2D1.1(b)(1).

27

28

The United States and Defendant have not reached any agreement with respect to any additional offense characteristics that may apply. The United States and Defendant are free to argue for or against any such characteristics at the time of sentencing.

c.   Acceptance of Responsibility

The United States will recommend that Defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) if Defendant does the following: accepts this Plea Agreement; enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement; demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct; provides complete and accurate information during the sentencing process; and does not commit any obstructive conduct.  In the event Defendant's total adjusted offense level is greater than 16, the United States will recommend a three-level downward adjustment.  *See* U.S.S.G. § 3E1.1(b).

Defendant and the United States agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

d.   No Other Agreements

The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances. Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this

Agreement, and Defendant's relevant conduct.

e.    Safety Valve

The United States and Defendant acknowledge that Defendant is not eligible for the safety valve provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.

f.    Criminal History

11.    The United States and the Defendant have made no agreement and make no representations as to the criminal history category, which will be determined by the Court, after the Presentence Investigative Report is completed.

12.    Incarceration

Consistent with this Rule 11(c)(1)(C) agreement, the United States agrees to recommend a sentence no higher than 240 months incarceration. Defendant agrees to recommend a sentence of no less than 168 months of incarceration.

13.    Supervised Release

The United States may recommend the Court impose up to a life term of supervised release, Defendant will recommend no less than a 5 year term of supervised release. Defendant agrees that the Court's decision regarding the term and conditions of Supervised Release is not a part of the Rule 11 agreement and that it is final and non-appealable; that is, even if Defendant is unhappy with the term and conditions of Supervised Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

a. The United States Probation Officer may conduct, upon reasonable suspicion, and with or without notice, a search of Defendant's person,

residences, offices, vehicles, belongings, and areas under Defendant's exclusive or joint control.

b. Defendant shall participate and complete such drug testing and drug treatment programs as the Probation Officer directs.

c. Defendant shall complete mental health evaluations and treatment, including taking medications prescribed by the treatment provider. Defendant shall allow reciprocal release of information between the Probation Officer and the treatment provider. Defendant shall contribute to the cost of treatment according to the Defendant's ability.

14. <u>Criminal fine</u>

The parties agree to recommend the Court impose no criminal fine.

15. <u>Forfeiture and Property Disposal</u>

The Defendant agrees to voluntarily forfeit and relinquish to the United States any and all right, title and interest, he has or may have, in all assets listed herein, and hereby agrees to execute any and all forms and pleadings necessary to effectuate such forfeiture of assets, including, but not limited to the following:

-any and all ammunition and firearm accessories seized on or about September 30, 2021, currently in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Defendant acknowledges that the assets listed above are subject to forfeiture pursuant to 21 U.S.C. § 853 as facilitating property and/or as property constituting proceeds obtained directly or indirectly from the offense Conspiracy to Distribute 400 Grams or More of Fentanyl in violation of 21 U.S.C. §§ 841, 846, to which Defendant is pleading guilty.

Defendant agrees to take all steps requested by the United States to pass clear title to these assets to the United States, and to testify truthfully in any forfeiture proceeding.

Defendant agrees to hold harmless all law enforcement agents/officers, and the United States, its agents, and its employees from any claims whatsoever arising in connection with the seizure and/or forfeiture of the assets listed above.

Defendant waives further notice of any federal, state or local proceedings involving the forfeiture of the seized assets that Defendant is agreeing to forfeit in this Plea Agreement.

Defendant waives all constitutional, equitable and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

Defendant knowingly and voluntarily waives Defendant's right to a jury trial on the forfeiture of these assets.

Defendant waives oral pronouncement of forfeiture at the time of sentencing, and any defects that may pertain to forfeiture.

Administrative Forfeiture:

The Defendant agrees to voluntarily forfeit and relinquish all right, title and interest he has in the following listed assets to the United States Drug Enforcement Administration (DEA):

- (200) Assorted Clothing/Shoes/Purses/Belts seized by DEA on or about September 30, 2021

The Defendant acknowledges that the assets are subject to forfeiture to the United States pursuant to 21 U.S.C. § 853 and/or 21 U.S.C. § 881, as facilitating property and/or as property constituting proceeds obtained directly or indirectly from violation(s) of 21 U.S.C. § 841 and are therefore forfeitable to the United States.

Defendant agrees not to contest the forfeiture of the above-listed assets in any administrative forfeiture proceedings initiated against said assets by DEA, and hereby agrees to execute any and all forms, documents, and pleadings, if necessary, to

effectuate the forfeiture of the assets. Defendant consents to the forfeiture of said assets without further notice of forfeiture proceedings.

Property Disposal:

The Defendant, does not claim an interest in the below-listed firearms, ammunition and accessories and does not oppose their disposal by destruction or return to a legitimate owner(s) by the Bureau of Alcohol, Tobacco, Firearms and Explosives:

- Lee-Enfield rifle, bearing serial number:12579;

- Benelli SuperNova 12 caliber shotgun, bearing serial number Z897898F19;

- Stevens Model 320 12 caliber shotgun, bearing serial number 151590D;

- Poly Technologies AK 47 7.62 caliber rifle, bearing serial number: CS-9069;

- Diamondback Arms DB-15 rifle, bearing serial number: 1701352;

- I.O. Inc. IO-15 rifle, bearing serial number: NH0000903;

- Smith and Wesson Model M&P 45, .45 caliber pistol, bearing serial number: NDL4810;

- Eibar Star Firestar 9mm pistol, bearing serial number: 1940790;

- Glock GMBH Model 48 9mm pistol, bearing serial number: BLFS614;

- Glock GMBH Model 29 10mm caliber pistol, bearing serial number: SCS463;

- Smith & Wesson M&P Shield, bearing serial number: JHR6769;

- Micro Conversion Kit;

- Silver firearms suppressor;

Defendant agrees to hold all law enforcement agents and the United States, its agents, and its employees harmless from any claims whatsoever arising in connection with the seizure, forfeiture, and disposal of any assets included in this plea agreement.

16.    Mandatory Special Penalty Assessment

Defendant agrees to pay the $100 mandatory special penalty assessment per count of conviction to the Clerk of Court for the Eastern District of Washington, at or

before sentencing, pursuant to 18 U.S.C. § 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

17. <u>Restitution</u>

The parties do not have an agreement on restitution. The United States intends to seek restitution on behalf of Traquan Morton at or before sentencing and reserves all rights thereto. The Defendant reserves all rights to contest the United States' request for restitution.

Defendant acknowledges that the Court's decision regarding restitution is final and non-appealable; that is, even if Defendant is unhappy with the amount of restitution ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or restitution order.

18. <u>Payments While Incarcerated</u>:

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, Defendant agrees to earn money to pay toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

19. <u>Waiver of Appeal Rights</u>

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court.

Defendant expressly waives all of Defendant's rights to appeal Defendant's conviction and the sentence the Court imposes.

Defendant expressly waives Defendant's right to appeal any fine, term of supervised release, or restitution order imposed by the Court.

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now

known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

If the Court indicates its intent to impose a sentence above the Rule 11(c)(1)(C) terms of this Agreement and Defendant chooses not to withdraw, then Defendant: (a) may appeal only Defendant's sentence, but not Defendant's conviction; (b) may appeal Defendant's sentence only if it exceeds 240 months; and (c) may appeal only the substantive reasonableness of Defendant's sentence.

Defendant expressly waives Defendant's right to bring any motion for Compassionate Release other than a motion arising from the bases set forth in Section 1B1.13 of the Sentencing Guidelines.

20.    Withdrawal or Vacatur of Defendant's Plea

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

      a.    this Plea Agreement shall become null and void;

      b.    the United States may prosecute Defendant on all available charges;

      c.    The United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

      d.    the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and defenses, including a claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including any alleged violations of any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

21. <u>Integration Clause</u>

The United States and Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and Defendant, and no other promises, agreements, or conditions exist between the United States and Defendant concerning the resolution of the case. This Plea Agreement is binding only on the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities. The United States and Defendant agree that this Agreement cannot be modified except in a writing that is signed by the United States and Defendant.

<u>Approvals and Signatures</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____          5/24/2022
Stephanie Van Marter                      Date
Richard R. Barker
Assistant U.S. Attorney

I have read this Plea Agreement and I have carefully reviewed and discussed every part of this Plea Agreement with my attorney. I understand the terms of this Plea Agreement. I enter into this Plea Agreement knowingly, intelligently, and voluntarily. I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or

inducements have been made to me, other than those contained in this Plea Agreement. No one has threatened or forced me in any way to enter into this Plea Agreement. I agree to plead guilty because I am guilty.

_Hunter O'mealy_          _5/24/2022_
HUNTER BOW O'MEALY          Date
Defendant

    I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept Defendant's guilty plea.

_Mark Vovos_          _5/24/22_
Mark Vovos          Date
Attorney for Defendant